# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENDA DARLENE HEFNER, ) | 1:07-CV-00345 GSA HC |
| ) | |
| Petitioner, ) | ORDER DENYING PETITION FOR WRIT |
| ) | OF HABEAS CORPUS |
| v. ) | |
| ) | ORDER DIRECTING CLERK OF COURT |
| ) | TO ENTER JUDGMENT |
| GLORIA HENRY, Warden, ) | |
| ) | ORDER DECLINING ISSUANCE OF |
| Respondent. ) | CERTIFICATE OF APPEALABILITY |
| ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties having voluntarily consented to exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1), by order dated August 27, 2007, this case was assigned to the Magistrate Judge for all purposes, including entry of final judgment.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tuolumne, following her conviction by jury trial on May 27, 2005, of kidnaping (Cal. Penal Code § 207(a)(2)) and assault with a firearm (Cal. Penal Code § 254(a)(2)). (LD[1] 4.) Two allegations that Petitioner had personally used a firearm during the commission of the offenses were found to be true. (LD 4.) On June 27, 2005, Petitioner

---

[1]"LD" refers to the documents lodged by Respondent with her answer.

was sentenced to thirteen years in state prison. (LD 4.)

Petitioner filed an appeal with the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On August 3, 2006, the Fifth DCA struck one enhancement but affirmed the judgment in all other respects. (LD 4.) On September 12, 2006, Petitioner filed a petition for review in the California Supreme Court. (LD 5.) The petition was summarily denied on October 18, 2006. (LD 6.)

Petitioner filed the instant federal habeas petition on March 2, 2007. Following a preliminary review of the petition, it was determined that Petitioner had failed to exhaust her state remedies with respect to Grounds Three and Four of the petition. She was granted leave to withdraw the claims in lieu of suffering dismissal of the petition. On April 7, 2007, Petitioner moved to withdraw the unexhausted claims, and Petitioner's motion was granted on April 13, 2007. The Court then directed Respondent to file a response to the petition. On July 6, 2007, Respondent filed an answer. Petitioner did not file a traverse.

## FACTUAL BACKGROUND[2]

Eighteen-year-old Amy lived with her boyfriend, Gregory. They had rented a room in the Owsleys' house for about one and one-half months. Michael, James and their father, Terry Owsley, also lived in the house. Terry usually bought groceries for the household every week and cooked dinner for everyone at night.

On March 3, 2005, at about midnight, Michael was on the couch watching television. Amy and Gregory were in their room. James was in his room watching television. Michael thought he heard someone yelling outside. He looked outside and saw someone walk through the gate at the sidewalk. The front door, which Michael believed was locked, flew wide open and [Petitioner], Amy's mother, walked in. She was wearing an overcoat. She seemed upset and she asked Michael where Amy's room was. Michael heard Gregory yell to Amy that her mother was there. He had been alerted to her presence because he had a monitor for the front door surveillance camera. [Petitioner] walked over to Amy and Gregory's room, turned the knob and pushed the door open. Michael could see a rifle barrel sticking out of the bottom of [Petitioner]'s coat. As [Petitioner] was entering the bedroom, [Petitioner] moved the rifle out of her coat. When he saw this, Michael got up and went to his room to find some sort of weapon he could hit [Petitioner] with.

Meanwhile, James had also heard [Petitioner] yelling in the front yard. He heard the gate swing open and the front door being kicked open. He heard [Petitioner] yell, "Where's [Gregory]?" He got up to see what was happening. His room was directly across from Amy and Gregory's room. James opened his door and saw an unfamiliar woman with a rifle, kicking in the door to their room. Gregory stood inside the open door and tried to close the door. [Petitioner] held the rifle by the stock with two hands, swung it like a bat and hit Gregory on the forehead. Gregory fell to the floor. James turned back into his room to get his

---

[2] The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of August 3, 2006, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). (LD 4 at pp. 2-9.)

gun from the safe. But when he returned from his room about 10 or 15 seconds later, [Petitioner] and Amy were gone. James heard screaming, yelling and cursing as they left the house and walked down the street. He heard Amy say, "No. Leave me alone."

Michael left his room through a back door and went outside. He saw [Petitioner] and Amy walking down the sidewalk. Amy was walking in front of [Petitioner] while [Petitioner] held the rifle under her arm with the barrel cradled across the top of her arm. [Petitioner] was pointing the rifle toward Amy. Both [Petitioner] and Amy seemed upset and they were talking loudly.

Gregory was bleeding from the injury to his forehead. He was rubbing his head and he seemed disoriented. James called the police.

James believed Michael had locked the front door that evening because, after [Petitioner] kicked the door open, the dead bolt shaft was broken in half and about 10 or 11 inches of the door casing was ripped away and the metal strike plate for the dead bolt was missing.

Deputy Rogers was dispatched to the Owsleys' house that night. Michael told him that [Petitioner] kicked in the bedroom door and yelled, "Get the fuck out." Amy yelled, "Don't shoot," and she and [Petitioner] left through the front door.

When Deputy Gorton arrived, Deputy Rogers told him that [Petitioner] had taken her daughter away with a rifle, possibly back to [Petitioner]'s apartment, which was across the street and down about 100 yards. Deputy Gorton, Deputy Erhardt and Sergeant DeMartini drove to [Petitioner]'s apartment. [Petitioner] answered the door and Deputy Gorton asked her to step outside. As [Petitioner] stepped out, Amy ran up the hallway screaming and ran out the front door. She was screaming as she tried to run past the officers. She appeared scared and confused. Two officers held Amy while the third conducted a protective sweep of the apartment and found the rifle on the floor in the back bedroom sticking out from under the bed. Sergeant DeMartini checked the rifle and found a round in the chamber.

[Petitioner] smelled of alcohol and her words were slurred. In Deputy Gorton's opinion, [Petitioner] was under the influence of alcohol. [Petitioner] told Gorton she had received a phone call at home from an unknown male who told her he was going to kill Gregory. [Petitioner] believed Amy was in danger. [Petitioner] told Gorton she was concerned for Amy's safety so she took the rifle to the Owsleys' house, went inside and removed her daughter. [Petitioner] said the front door was unlocked and she just walked in. She said Amy went with her willingly and they walked back to the apartment. [Petitioner] said she pointed the rifle at the ground as they walked. She said she did not point the gun at anyone or hit anyone with it. She took the gun to "get [Gregory] to shut up and for her protection."

Deputy Rogers later spoke to [Petitioner] at the jail and advised her of the charges against her, to which she stated, "What a crock of shit. The only thing that really happened is I opened the front door and let myself in."

Investigator Moss went to the Owsleys' house the next day and took photographs. Moss took a photograph of Amy and Gregory's bedroom door because there appeared to be a partial footprint on the door. Moss learned that a warrant had been issued for Gregory's arrest. On March 8, 2005, Gregory pled guilty to felony transportation of methamphetamine. He failed to appear for sentencing and a warrant was issued. Amy was required to appear in juvenile court on May 24, 2005, for an offense she committed on January 10, 2005, but she failed to appear and a warrant was issued for her arrest.

Investigator Moss then went to the jail to interview [Petitioner]. [Petitioner] said she had gone to the Owsleys' house because Amy would not return her telephone calls and because Amy had told her Gregory had guns in the room. She said she took the rifle because she thought Gregory had guns in his room. She said she did not break in, but just opened the door and walked in. To enter the bedroom, she also just opened the door. Inside the bedroom, she saw Gregory across the room pointing a gun at her. She told Amy to "come on." Amy left with her willingly and they walked back to [Petitioner]'s apartment side by side. [Petitioner] said she never pointed the rifle at anyone.

During [Petitioner]'s statement to Investigator Moss, [Petitioner] did not mention she had gotten a telephone call from someone who said he was going to kill Gregory, and she did not say she was concerned because she thought Amy was afraid of Gregory.

The jury was shown a copy of the recording made by Terry's surveillance camera mounted in the front of his house. On the recording, a voice demanded, "Come out now." Then James said, "A woman just came into my house." Amy screamed loudly and almost hysterically.

James testified that he believed Amy and Gregory were using drugs because they looked unhealthy, thin and "big-eyed." Amy particularly had this appearance. She had looked that way from the day she moved into the house. James also stated he had seen a rifle in Amy and Gregory's room.

*Defense Evidence*

[Petitioner] testified that Gregory had gotten out of jail on December 18, 2004, and began staying with Amy at [Petitioner]'s apartment. [Petitioner] described Gregory's presence in her apartment as "tormenting and terrorizing." He put up surveillance cameras outside her apartment. A lot of people came into the apartment, especially during the night. Gregory had a gun, which [Petitioner] saw on the counter in the bathroom. She also saw him pull a gun out from under the mattress. She believed Gregory was involved in drugs. He told her he was an addict and he could not help it. On January 10, 2005, the police found a scale, a pipe and a gun. As a result, charges were brought against Amy, and [Petitioner] faced being evicted from her apartment. Amy and Gregory moved out so [Petitioner] would not be evicted. When they left, Gregory gave [Petitioner] a rifle. He said he left it loaded for her so she could use it to kill herself.

[Petitioner] began to notice changes in Amy after she and Gregory moved out. Amy dropped out of high school, lost weight and pulled out all her eyelashes. When Gregory was gone, Amy would come to [Petitioner]'s apartment and get food, shampoo and soap. Amy said there was no food in their house; there was nothing but dope and guns. Amy said Gregory would not allow her to leave or go to [Petitioner]'s apartment.

On the day of the incident, [Petitioner] was upset because Amy was supposed to come to the apartment to eat with her. [Petitioner] had been waiting for Amy since 6:00 p.m. [Petitioner] believed Gregory was not providing Amy with food or allowing her to eat. [Petitioner] wanted to feed Amy.

At about 8:00 p.m., [Petitioner] received a telephone call from someone who said he was going to kill Gregory. Because [Petitioner] was upset, her neighbor brought over a bottle of vodka and added it to [Petitioner]'s tea. [Petitioner] continued to drink the vodka and tea from about 8:30 to 10:30 p.m. She did not realize she was drunk until she was arrested later that night.

Amy called [Petitioner] at about 11:00 p.m. and said she wanted to come over and

eat. In the background, [Petitioner] heard the door open and slam and she heard Gregory yelling and cursing. He took the telephone and told [Petitioner] never to call again. He told her she would not get to see Amy again, Amy belonged to him and [Petitioner] should stay away. He told [Petitioner] he was going to kill her. He told her to put the gun he left her to good use and kill herself with it. He said he left a bullet in it for her.

[Petitioner] decided she would take that rifle and go to the Owsleys' house. She thought she needed the rifle because she knew Gregory and the Owsleys had guns in the house. She knew the house "had nothing but men in it except for [Amy]" and she had been told the house was "full of arsenal and drugs...." She had been told Gregory would shoot anyone who went to the house. She had known the Owsleys since 1999 because her son associated with another Owsley boy. She knew the Owsleys were hunters and had a gun case. She "didn't feel like [she] could just walk into a house full of men with an arsenal." She was angry and she did not think her plan through. She was determined to feed Amy.

[Petitioner] took the rifle, walked to the Owsleys' house and stood at the gate of the house. She yelled for Amy to come out because she knew there was a surveillance system and she would be observed. She then walked to the front door, turned the knob and opened it. She did not kick the door open; it was already damaged. Inside, Michael stood up from the couch. [Petitioner] asked him where Amy was and he pointed to a bedroom door. [Petitioner] walked to the bedroom door and called Amy's name. [Petitioner] heard noise inside the bedroom so she turned the knob and opened the door. She did not kick the door. Amy was standing on the bed. She jumped on the bed and screamed that [Petitioner] was a "crazy bitch." Gregory stood at the far end of the room and pointed a gun at [Petitioner]. [Petitioner] told Amy, "Come on," but Amy was yelling and jumping. She called [Petitioner] "crazy." [Petitioner] heard Gregory's gun click. Amy yelled, "Don't shoot," then she ran out of the room. [Petitioner] heard a second click of the gun, after which Gregory kicked the door shut. [Petitioner]'s finger was caught in the door and she tried to free it but Gregory was pressing on the door. [Petitioner] pushed her shoulder against the door and removed her finger.

In response to this activity, James opened his door and asked what was going on. [Petitioner] walked out of the house. She found Amy waiting on the front porch, conversing with Michael. Amy and [Petitioner] walked home together. On the way home, Amy told [Petitioner] she was crazy, was a "stupid bitch," and was going to be arrested.

[Petitioner] testified that she never pointed the rifle at Gregory; she kept the barrel pointed downward. She held the rifle by the stock and carried it only to keep Gregory and the Owsleys away from her. She had no intention of using it. She held it in such a manner that it would have been impossible for her to shoot it. [Petitioner] never touched Amy and never pointed the rifle at her. They walked side by side back to the apartment while [Petitioner] held the rifle pointed downward. [Petitioner] did not cradle the rifle over her arm.

When she and Amy arrived at the apartment, Amy opened the door and walked in first. Amy told [Petitioner] she was a "dumb bitch." Amy said she was stupid and crazy and was going to be arrested. [Petitioner] told Amy she was stupid for hanging out with Gregory. Amy went to her room. [Petitioner] went to her room and tossed the gun on the floor. She sat down on the couch in the living room. She asked Amy, "Are you ready to eat?" Amy laughed at her and said, "You are crazy." At that point, the police arrived at the front door.

***Rebuttal Evidence***

Investigator Moss testified that [Petitioner]'s demeanor in jail was very calm. She was not crying. She never mentioned that Amy was hungry or had no food. She said Amy would not return her telephone calls. [Petitioner] said she went to get Amy because Amy told her Gregory had guns in the house and [Petitioner] thought Amy was afraid. [Petitioner] told

Moss that Gregory pointed a gun at her but she did not mention that he pulled the trigger.

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that she suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tuolumne County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

## III.  Review of Petition

### A.  Ground One

Petitioner first claims the trial court erred by failing to give a lesser-included offense instruction on false imprisonment as to the kidnaping count in violation of her Sixth Amendment right to jury trial.

This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), where it was rejected in a reasoned opinion. (LD 4.) It was then presented to the California Supreme Court in a petition for review where it was summarily denied. (LD 5, 6.) The California Supreme Court, by its "silent order," is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the appellate court stated:

> False imprisonment is a lesser included offense of simple kidnapping. (*People v. Magana* (1991) 230 Cal.App.3d 1117, 1121.) The difference is that "kidnapping ... requires a degree of asportation not found in the definition of false imprisonment." (*People v. Reed, supra,* 78 Cal.App.4th at p. 284, fn. omitted.) Asportation requires that the victim's movement was " 'substantial in character.' " (*People v. Martinez* (1999) 20 Cal.4th 225, 237.) In determining whether the movement was substantial in character, the jury may consider the totality of the circumstances, including "such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Ibid.,* fn. omitted.) But "[w]hile the jury may consider a victim's increased risk of harm, it may convict of simple kidnapping without finding an increase in harm, or any other contextual factors. Instead, ... the jury need only find that the victim was moved a distance that was 'substantial in character.' [Citations.]" (*Ibid.*)
>
> "California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." *People v. Breverman* (1998) 19 Cal.4th 142, 148-149 .) But "it has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense." *People v. Kelly, supra,* 51 Cal.3d at p. 959.) In other words, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.) Thus, "a lesser included offense instruction on false

> imprisonment is not required where the evidence establishes that defendant was either guilty of kidnapping or was not guilty at all." *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1233 [evidence showed defendant's conduct either went beyond mere violation of victim's personal liberty or it was not culpable]; *People v. Kelly* at p. 959 [evidence pointed to attempted kidnapping and defendant did not argue that his only purpose was to forcibly detain victims].)
>
> In this case, there was no evidence from which a jury could have found that [Petitioner] committed false imprisonment rather than kidnapping. [Petitioner] explained that she went to the Owsleys' house *to get Amy* and bring her back to her apartment. Amy's movement from the Owsleys' house to [Petitioner]'s apartment was substantial-across the street and another 100 yards-regardless of whether the movement exposed Amy to increased (or decreased) harm. There was no evidence that [Petitioner] intended to detain Amy at the Owsleys' house or to move her any insubstantial distance. [Petitioner]'s defense was that Amy left with her willingly and therefore she committed no crime by accompanying Amy from the Owsleys' house to [Petitioner]'s apartment. [Petitioner] did not dispute the extent or substantiality of Amy's movement; [Petitioner] disputed that Amy's movement was made against her will or without her consent. Under these circumstances, [Petitioner] was either guilty of kidnapping or she was guilty of no crime. The trial court had no obligation to instruct on the lesser offense of false imprisonment.

(LD 4 at pp. 10-11.)

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625, 638 (1980). In a noncapital case, the failure of a trial court to instruct sua sponte on lesser included offenses does not present a federal constitutional question. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the application of Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300, 109 S.Ct. 1060, 1069 (1989));  James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*).  However, a defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting her theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984); see, also, United States v. Mason, 902 F.2d 1434, 438 (9th Cir.1990) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence.").

In this case, the failure to instruct did not preclude Petitioner from presenting her theory of defense. As noted by Respondent, Petitioner did not dispute the subject of Amy's movement. She conceded that she accompanied Amy from the Owsley home to her home. Petitioner's defense was

1  that Amy left with her willingly. Therefore, Petitioner was either guilty of kidnaping or not. The

2  failure to instruct on false imprisonment did not deny Petitioner her defense. The claim must be

3  rejected.

### B. Ground Two

In her second claim for relief, Petitioner contends the imposition of the sentence enhancement of ten years for use of a firearm was cruel and unusual punishment in violation of the Eighth Amendment.

This claim was also presented on direct appeal and rejected in a reasoned opinion. (LD 4.) It was then raised in a petition for review and summarily rejected. (LD 5,6.) The California Supreme Court is presumed to have denied the claim for the same reasons stated by the appellate court. Ylst, 501 U.S. at 803.

The appellate court rejected the claim as follows:

> Here, although [Petitioner] may have been motivated by her concern for her daughter, [Petitioner] deliberately chose to create a situation she knew would be dangerous. She knew guns were present in the Owsleys' house; she knew Gregory had a gun and had threatened to kill her; she knew Gregory was involved with drugs and had threatened to shoot anyone who came to the house; she knew Gregory was possessive of Amy and had refused to let her see [Petitioner]; she knew the house had surveillance cameras, which reasonably suggested the inhabitants were concerned about intruders; and she knew it was late at night and the inhabitants would be particularly alarmed by an armed intruder. Despite these circumstances, [Petitioner] armed herself with a loaded rifle and came to take Amy by force. Predictably, after [Petitioner] entered the house, both Michael and James sought weapons to use against her when they realized she was armed. Michael looked for an object with which to strike [Petitioner]. James, who was not familiar with [Petitioner], attempted to arm himself in response to the intrusion by an armed stranger. According to [Petitioner], Gregory aimed a gun at her and attempted to shoot it twice while bystanders were nearby.
>
> [Petitioner]'s actions created a serious danger that she or one of the inhabitants of the Owsleys' house would be injured or killed. Although [Petitioner] did not fire the rifle, her display of the firearm set in motion dangerous consequences. Furthermore, [Petitioner] elevated the potential for violence when she used the rifle to strike Gregory. This situation easily could have resulted in the very outcome the Legislature intended to avoid by deterring such behavior. "The ease with which a victim of one of the enumerated felonies [or a bystander present during its commission] could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives." *People v. Martinez, supra,* 76 Cal.App.4th at pp. 497-498.)
>
> As for the nature of the offender, we recognize, as did the trial court, that [Petitioner] had no prior criminal record and that she ostensibly committed this offense for what she believed to be in her daughter's best interest. However, we cannot say that her punishment shocks the conscience and offends fundamental notions of human dignity. [Petitioner] committed a serious and dangerous offense. Indeed, it is surprising her actions did not result

> in further injury or death. We must conclude that [Petitioner]'s punishment does not amount to cruel or unusual punishment.

(LD 4 at pp. 13-14.)

A criminal sentence that is not proportionate to the crime for which a defendant is convicted may indeed violate the Eighth Amendment. In Lockyer v. Andrade, 123 S. Ct.1166 (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality review and held that the only clearly established governing legal principle is that a "gross disproportionality" review applies to criminal sentences for a term of years. Id. at 1173. Citing extensively to its past cases dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent path for courts to follow." Id. The Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' frame work is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Id.[3]

In Ewing v. California, 123 S. Ct.1179 (2003), the Supreme Court again reviewed the Supreme Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view[4] that:

> [There are] four principles of proportionality review-- the primacy of the legislature; the variety of legitimate penological schemes; the nature of our federal system; and, the requirement that proportionality be guided by objective factors– that inform the final one: The Eighth Amendment does not require strict proportionality between the crime and the sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.

Ewing, at 1186-1187.

In this case, the state court's conclusions were objectively reasonable as Petitioner's enhanced sentence of 10 years was not grossly disproportionate to the offense of carrying a firearm. Expecting danger, Petitioner carried a rifle to the Owsley residence. Her objective was to retrieve her daughter who was in the company of someone who had threatened to kill her and who she knew

---

[3] The Court recognizes that other Supreme Court cases have dealt with cruel and unusual punishment. See Solem v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263, 276 (1980). However, these cases analyze cruel and unusual punishment in the context of recidivist statutes. In this case, Petitioner was sentenced for her current conviction.

[4] As expressed in his concurring opinion in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991), citing Solem v. Helm, 463 U.S. 277, 288 (1983).

possessed a firearm. Petitioner actually used the rifle to hit Gregory in the forehead. Her use of the weapon caused the other residents to scramble for their own weapons to respond. By using the rifle, Petitioner created a grave situation in which someone could easily have been killed or seriously injured. This is precisely why an enhanced sentence was deemed appropriate. Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). The claim must be denied.

## IV.  Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>>  (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>>  (B) the final order in a proceeding under section 2255.
>
>  (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
>  (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the

petitioner is not required to prove the merits of her case, she must demonstrate "something more than the absence of frivolity or the existence of mere good faith on [her] . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **September 9, 2008**                    /s/ **Gary S. Austin**
                                                  UNITED STATES MAGISTRATE JUDGE